## 31051. WALDEN v. THE STATE.

DECIDED FEBRUARY 15, 1946.

*Howard, Camp & Tiller,* for plaintiff in error.
*D. P. Philips, solicitor, Walter P. McCurdy,* contra.

MACINTYRE, J. J. R. Walden was convicted by a jury in the city court of Decatur on an accusation charging him with the offense of operating an automobile on the public highway at a greater rate of speed than 55 miles per hour, a misdemeanor. He moved for a new trial, and the judge overruled the motion. To this judgment the defendant excepted.

The evidence is substantially as follows: Walden, the defendant, with several other people, were discussing the speed of two Ford Automobiles. Lancaster, a witness for the State testified in effect as follows: "I was participating in the conversation and there was one or two others. J. R. Walden was one, and I think Bobby Bolling said something about it. We decided to go to Buford Highway and try them out. We started around Norcross [Georgia] somewhere. When we left, I was in the 1940 Ford coupe with the gear shift on the steering wheel. . . The first time I saw Walden after I left the parking lot was at the scene of the accident. I did not see him at the starting place. I saw him at the garage, but not after we got to the starting place. I was waiting on the other

car, and I thought Walden was driving his car but Bolling was driving Walden's car. He pulled up beside me and asked if I was ready to go, and I said I thought Walden was going to drive his car and Bolling said, 'You are not scared of me driving, are you?' And I said, 'No,' so he said, 'Let's go.' . . The approximate speed during the entire race was approximately 92 miles per hour." On cross-examination he testified: "There were four or five boys at the garage when we had our discussion on whose automobile was the faster. Walden said the Ford with the gear shift in front was the faster. Bobby Bolling said the coupe was the faster. Walden said his car would make 85 miles an hour. . . We were just discussing the speed of cars. Walden didn't say anything about a race. I don't know whether Walden made any suggestion or not. Walden said the Ford with the gear shift in front was faster than the coupe, then Bolling took it up, and Bolling, Hall, and myself discussed it. We agreed to go try them out on the Buford highway. A. V. Smith and Bolling were in one car and Mitchell and I were in one car. The Cadillac belonged to Bobby Bolling. If Walden was in his car, he was driving. I didn't see him until after the race started." On redirect examination: "I remember making a statement in your [the solicitor's] office. I stated that when I got to the scene of the wreck, I thought J. R. Walden was going to drive his car. Bobby Bolling had this car tuned up. He thought he was going to buy that car from Walden. He tried to buy it from Walden then, and Walden said, if he could get another one, he would sell it to him. Bolling carried it and had it tuned up. Walden didn't have the car tuned up. Bolling had it tuned up. This conversation took place 30 days prior to the wreck. Bolling borrowed Walden's car to work with and had it tuned, but had not bought the car so far as I know. He tried to buy that car but Walden would not sell it to him. . . Bolling didn't buy the car as I know of." Fouts testified for the State in part as follows: "While I was there [the Henry Grady parking lot], a discussion came up about two cars, between J. R. Walden and Felton Lancaster, but I didn't pay too much attention to what was said about it. They just got to talking and someone suggested trying them out. I don't remember the words said. The conversation was about two automobiles, but I don't know exactly what was said about them. I don't know anything about any money being bet

on the race. I left Henry Grady parking lot in the Cadillac; Roy Hall was operating it. . . J. R. Walden and Kathryn Jenkins got in the Cadillac later, before the race started. They were in another car before they got in the Cadillac. Two cars got ready to go. They were side by side and Bobby Bolling started up and got in the lead. I would say he got in the lead between 30, 45, or maybe 50 feet and continued that way practically all the way. The Cadillac [in which were the defendant and the witness] was pretty close behind the two cars racing. The lights were on the cars. You could see very well. I could not tell how fast the Cadillac was going, but I would say from 75 to 90 miles an hour, and it stayed some distance behind the racing cars, and it stayed the same distance all the time [the defendant and the witness were, in effect, accompanying the racers at a close distance behind. One of the racing automobiles belonged to the defendant]. There was a remark made in the Cadillac automobile about the car in front not racing fairly. . . I did not hear Bolling, the boy that got killed, say anything about buying this car from Walden. . . I don't remember which one suggested the race. J. R. Walden and Felton Lancaster were talking about two cars and someone suggested trying them out. . . Walden told Bolling, if he wrecked his car, he would have to pay for it." Mrs. Kathyrn Jenkins, testified for the State in part as follows: "At midnight on the 20th day of May, I was at the Henry Grady parking lot No. 1. I was with J. R. Walden. . . While I was there a discussion came up about the speed of automobiles. This discussion was between Bolling and Lancaster, but I don't remember the exact words. It was about the speed of automobiles, which one was the faster. I left the garage with Walden, Bolling, and Smith, and that is all that was in that car, I was in the green Ford, and it belonged to Walden at that time. Walden was driving the car when we left, and I can not say the exact spot he drove the car to, but it was quite a ways from Twelve Oaks. . . Walden and myself got in the Cadillac and that left Bolling and Smith in the green coupe. Mr. Bolling purchased the car from Walden, because he was the one that was going to drive it, and agreed to pay him $1000 for it. I said at the coroner's inquest that he agreed to pay Walden $1000 for it. I had a conversation with you prior to the inquest, and prior to this trial, in one of the rooms downstairs. I testified that Bolling was

driving Walden's car. I don't believe I mentioned to you at the coroner's inquest that Bolling bought the car from Walden. . . He [Bolling] had been trying to buy the car for several weeks. At first, Mr. Walden asked him $1200 for it, and he said that was too much. After we passed Twelve Oaks, Walden and myself got out [of the green Ford] and got in the Cadillac. Bolling insisted on driving Walden's car, and Walden said if you are going to drive this car, you are going to pay me for it if you wreck it. Before we got out, Bolling agreed to pay him $1000 for it the next day. When Walden got out, he said it's all yours, Bolling. . . I don't know whether Bolling had money to pay for Walden's car that night or not." Mr. Foster testified for the State: "I am captain of police department, DeKalb County. I made an investigation of the wreck in which Bobby Bolling was killed on May 21. (Mr. Phillips hands the witness a piece of paper to be identified.) This is a receipt for an automobile, a '39 Ford, signed by J. R. Walden, as owner. It is dated May 23, 1945. Bobby Bolling was driving this automobile. I did have a conversation with this defendant concerning the ownership of the automobile after the wreck, and he said he owned the automobile. . . This car was pulled in Esco's Garage. Mr. Walden got this order from me and chief of police to go to Esco's garage and get the wrecked car. This is the receipt he turned over to me three days afterwards. The car was registered in his name. He had the license bought but didn't put it on. He told me Bolling had tried to buy the car from him two weeks before. Bolling offered him $900 and he wanted $1000." The defendant made the following statement: "Gentlemen of the jury, I operate several stations in Atlanta. I am in the garage business. I have been a used-car dealer for the last two years. I appeared at the Henry Grady garage about 1:30 o'clock in the morning. These boys were there and the girls, all but one. They were talking about whose car was the faster. Bobby Bolling had been using my car. The week before, he had it tuned. Bolling wanted to borrow my car, and I said, 'Bolling, I won't let you have my car because you are drinking. He said I'll buy it from you;' and I said, 'You don't want to pay my price,' and he said he would pay me $1000 for it. We started up the highway, and I was driving my car when we went up the road. . . We just slowed up at the place they stopped. I got out at Windsor Castle. I did not let

him have the car until he said he would pay for it. He had been trying to buy the car for several weeks. He said he would give me $1000, and that's when I got out and hailed the other car down. We got in the car with Roy Hall. We got in the back seat, then Hall turned the car around and went up the road towards Buford. When we went up the road, they were getting ready to start."

All who participate in misdemeanors, if guilty and punishable at all, are principals and indictable as such. In other words, in misdemeanor cases the law does not distinguish the participants therein, but all are alike guilty as principals.

The jury were authorized to find under the evidence that the defendant, by taking part in the conversation as to whether his car or some other car was the faster, and then authorizing some third person to drive his (the defendant's) car in a race to determine which car was the faster, was guilty of operating an automobile upon the public highway at a greater rate of speed than fifty-five miles per hour, for all who procure, counsel, command, aid, or abet the commission of a misdemeanor are treated by law as principal offenders. *Kinnebrew* v. *State*, 80 *Ga.* 232 (5 S. E. 56); *Loeb* v. *State*, 6 *Ga. App.* 23 (64 S. E. 338).

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*